14-1123 Energy Future Coalition, et al., Petitioners v. Environmental Protection Agency, and Gina McCarthy. Mr. Gustafson for the Petitioners, Mr. Augustini for the Respondents. Good morning. May it please the Court, Adam Gustafson for the Petitioners. This is a challenge to EPA's alternative test fuel rule, which purports to allow automakers to certify new vehicles on new test fuels. Instead, the rule blocks new fuels and highly efficient vehicles that are already on the road in other countries. It's a fundamental principle of administrative law that a rule is unreasonable if it is logically impossible to satisfy. It's EPA's requirement that a test fuel be commercially available is just such a rule. It's against the law to introduce a fuel into commerce unless it is substantially similar to an existing test fuel. Why doesn't it make sense in terms of test fuels to use fuels that are actually in the marketplace, however, given the overall purpose of this particular statute and this provision? We're talking about test fuels, so you test based on what's actually out there. Well, first, Rona, there are different purposes at play here, and certainly avoiding misfueling is one legitimate purpose of the act. But that's not the only legitimate purpose here. The Clean Air Act clearly anticipates that new fuels will be introduced. Without new fuels, it would be impossible, for example, to comply with the Clean Air Act's Renewable Fuel Standard, which requires increased levels of biofuel blending into the nation's fuel pool. And so any purpose that would require a blanket ban on new fuels is violative of that purpose. But here, the government has offered basically two responses to the logical impossibility problem, neither of which was offered in the proceeding below, and neither of which is really responsive. First, the government claims for the first time in its response brief that this commercial availability requirement is just a discretionary factor. That's wrong as a matter of law, and I'm happy to address the hour deference question, but it shouldn't make a difference to the outcome of this case, whether it's a discretionary factor or a requirement, as EPA itself said it was in Tier 3 and as the rule itself proclaims. But it makes no difference. Under this court's precedent in Alliance for Cannabis Therapeutics, even a, quote, factor that is impossible to fulfill must be regarded as arbitrary and capricious. That case involved an eight-factor test for whether to delist marijuana from Schedule I, and the court noted it wasn't even clear which of those eight factors the DEA had actually applied. The same holding is evident in a case not cited in our brief, security point holding v. TSA. That's 769F3-1184. In that case, the court noted that there were new indemnity clauses that were required for airports for a certain program dealing with security that would have made it difficult or impossible for airports to participate in that program. And the court actually noted that one airport had made use of the program, made use of that clause. So absolute impossibility is not a requirement here. Could I ask you to step back to an antecedent issue here and address the EPA's argument that both categories of your clients lack standing? And maybe you could start by distinguishing for me our Chamber of Commerce decision, where we held there that car dealers lack standing because even absent the challenge regulation, they would suffer the same. The problem would be unchanged. In other words, it wouldn't be any different. And why isn't that absolutely true here, given the comments of the car manufacturers in the regulatory, in their comments that even absent this regulation, there are other problems blocking that could block E30, such as consumer confidence and absence of infrastructure? Let me try to answer those questions in order. Just one question. Well, okay, Chamber of Commerce. I have another question for your other category of clients. In Chamber of Commerce, the court noted that the auto industry wanted to make efficient vehicles anyway. It cited comments from Ford that there were consumers who valued fuel efficiency for its own sake, and so it would do the right thing, the industry said, in building efficient vehicles, even if the government didn't require it. Of course, that's not possible here. We have a rule that's effectively blocking the progress that we're seeking. But here as there, the manufacturers say there are other obstacles beyond the regulation that are blocking E30, other issues that have to be dealt with first. So even if we were to vacate this, you would still have infrastructure problems and consumer confidence problems. Well, any change to vehicle technology and fuel technology requires kinks in the system to be worked out. So it's certainly true that we're talking about design changes and introducing a new concept to consumers, but that's happened before. But all that's critical to standing analysis, right, because of the causation and redressability parts of it. If there are a lot of other factors at play here, then you can't really say that the commercial availability regulation is necessarily the cause of the problem. Well, it's true. That's what Chamber seems to say. Well, we know that it's not the petitioner's duty to overcome every speculative hindrance to redressability, so that can't be the requirement. I cite the International Ladies' Garment Workers Union and also Oklahoma, the Oklahoma case. But here, the auto industry's comments overall, although they acknowledge that there are questions they need to resolve, specifically about what the precise number should be of the ethanol blend, it's evident that the auto industry wants this fuel and that they think it will be very helpful in achieving their fuel efficiency requirements, which become increasingly stringent under the CAFE rule, capping out at 54.5 miles per gallon in 2025. How do we know, Mr. Gustafson, that the auto manufacturers want this rule? They're not here before us, and they didn't so say in the rulemaking. With respect, Your Honor, they did ask the court to remove this regulatory burden. They challenged the- Asked the court? I'm sorry. They asked the agency in the Tier 3 proceeding to remove this burden. Ford, for example, strongly recommended that EPA pursue regulations and other measures to facilitate the introduction of higher octane rating market fuels. That's at page 144 of the appendix. Mercedes also said that octane is the most important fuel parameter when determining engine design for performance, efficiency, and environmental impact. It pointed out that it already has E25-capable vehicles in other global markets that could be introduced into the United States. Ford, likewise, pointed out that these high-compression engines that demand a higher level of octane are already on the road in other markets, and they could be introduced into the United States without significant design change. And I suspect that part of your point is that developing a vehicle is something that takes quite a bit of lead time. I mean, one of the-you know, when one looks at this record, one of the concerns is it feels quite premature and speculative. We don't-you know, I understand your-what you call your logical impossibility argument that there's a, you know, which comes first. Car makers aren't going to develop E30-compatible cars if it's not going to be commercially available. They won't be able to test them, and the fuel manufacturers aren't going to produce this and make it commercially available if there's no consumers for it. So there's a little, you know, which comes first. But my sense is that EPA is very much behind developing a new technology consistent with Clean Air Act requirements, and that, in fact, you know, other fuels have come on market despite, as a practical matter, quite similar requirements. And so I guess my question is-it's a long-winded way of asking, wouldn't it be important for the court to see how EPA is actually going to interpret and use this when asked by automakers and the fuel industry? Here we have these, you know, these cars we're using overseas, and we have this desire to go this way, and to see whether they say, you know, logical possibility go away. Well, Your Honor, first, I'll point out that the last genuinely new test fuel that EPA approved was in 1994 when it approved natural gas and propane. In the Tier 3 proceeding, it put in new parameters for standard gasoline, now E10 and E85, but those fuels were already available. So I don't think we're seeing- But the natural gas example is a situation in which they were concerned about commercial availability, as a general matter. They've long been concerned about that, and yet there was a shift, a sea change in the kinds of fuels that are used. Well, I think that example works to our advantage because it demonstrates that when the agency approved new test fuels, it did so outside the ambit of this rule. And, in fact, the natural gas and other test fuels that EPA approved could not have been approved under this rule. Natural gas was not readily available nationwide. I'm not so sure that it couldn't have been. I guess that's my point. I think they've been regarding commercial availability as significant for the very reasons that they've formalized it in this rule. And the question is, wouldn't they behave in a similar way under this rule? Well, I mean, I would point you to page nine of our brief. In the footnotes, we point out that there were less than or just over a thousand stations in 1994 when the final natural gas rule was promulgated, and 349 when the rule was proposed. And most of those stations weren't actually available to the public. You couldn't buy natural gas there. So I'm not sure that's true, but if we look at other examples, such as methanol, it's clear there was no commercially available methanol to speak of when EPA approved that test fuel. And I think we should take the agency at its word here. When it received comments in this very proceeding in response to the direct question about whether there are problems with this standard, with this commercial availability rule, and it acknowledged criticisms that those criteria were too severe and decided to keep them anyway. So I don't think that we should read into- But that's because the test fuel should reflect the real world, right? I mean, I understand your point about how the statute and the policy is to get new fuels introduced, but it seems like when you're talking about testing for purposes of emissions, testing an engine for purposes of emissions, you would want to test it just as a matter of common sense, this is their theory, based on what's going to actually be used. And what's the flaw in that seemingly commonsensical reasoning? Well, for one thing, I don't think we should take their statements in the brief too seriously. In the Tier 3 proceeding, EPA itself approved an E85 test fuel that was not consistent with in-use E85. It specifically said that it should not choose the typical E85 fuel that was available in the market. But putting that aside, just on my question, if you could answer it, it just seems like just on anything, we're going to test something to see whether it is going to be a problem. Well, you would want to test it based on what's actually going to be used in the real world. Well, there are other ways of controlling what's actually used in the real world. And so we've seen those mechanisms at work. For example, when EPA approved an E15, granted a substantive waiver for E15, warning labels are available. And I would guess that you've never filled your car with diesel fuel, even though it's available at the same gas stations that you fill up at. There are ways, technological, mechanical ways of preventing misfueling and ensuring that drivers actually use the fuel on which the vehicle was certified. So just going back to the methanol example, I think one reason that that's, you said that what happened then could not have happened under the rule that's proposed for 2022. And I guess it's just not that clear to me that that's the case. Because as I said, I believe that the agency has long been concerned about commercial availability for the reasons that we've been discussing. And that there, what the agency required was that there be a justification provided for the proponent's belief that the fuel would be commercially available. So that the commercial availability criterion was applied, but it was applied in a realistic way, knowing that this is, you know, in a sort of fluctuating and developmental situation. And I guess it feels unripe to me in the sense that we don't know whether that's going to be the approach here. And it seems consistent with the regulation to take that approach. Two points, Your Honor. First, on methanol, it's true that that rule refers to commercial availability. But that consideration was for after the approval of the initial methanol test fuel. So I would point you to page 14446 of Volume 54 of the Federal Register. It's clear there that EPA approved a methanol test fuel between the range of 50 and 100 percent methanol. And the industry said, hey, that's way too broad. How can we design vehicles that are, you know, optimized around this fuel with such a broad standard? And EPA acknowledged that criticism and said, in the future, when the fuel is available, then you can nominate a more specific parameter based on commercial availability. So my point here is commercial availability came in after the decision to approve the test fuel, not before. And here our concern is that the agency, that the industry, is never going to take that step of asking for an alternative test fuel as long as there's a commercial availability requirement on the books. Well, they would if they thought that it would produce a cleaner and much more desired car in the market. I guess what it sounds like is that you're asking us to privilege your clients' fuel and to become sort of a push agent in the market by blessing yours over others without any firm showing that there are auto manufacturers who think this is the way to go. And that just seems, I mean, it just seems like this is something we should leave to the agency and the market to develop before we presume an interpretation that we don't yet see. To be clear here, Your Honor, the remedy we're seeking is fuel neutral. We're not asking you to order EPA to do anything with respect to E30 or any other fuel. We're just trying to remove a barrier to the introduction of all alternative test fuels. Now, it so happens that the industry has focused around E30 because that is the fuel, some mid-level ethanol blend in that range is the fuel that would achieve the best fuel efficiency benefits. And that's of great importance as the industry's own comments reflect. And I also wondered about the commercial availability and what kind of a hurdle that that poses in light of the availability of flex fueling at the pump. Apparently, this is, you know, one learns when one studies for an oral argument and deciding of a case. Apparently, there are already many, many pumps where the vendor can actually overnight change E10 to E30 simply by programming the dispensing differently. And so one could come forward if an automaker were interested and say, at least recently, overnight, this is available, let's go. Well, Your Honor, we think that fact demonstrates the feasibility of the redress that we're seeking here. But it's not legal today to use those pumps to sell E30. Under the sub-sim law, it's illegal to introduce a fuel into commerce unless it's substantially similar to a test fuel. Isn't that your problem? You can't get it into the market because of that statutory problem, which in turn then means it's not going to be commercially available for the test fuel issue. But the statute seems like it might be the source of that problem. Well, certainly the interaction of the two causes this chicken and egg dilemma. But that problem is solved entirely when the commercial availability requirement of the test fuel rule at issue here is removed. We're not challenging that sub-sim statute. I see that I'm almost out of time, but I would like to address the false premise that the government relied on, if I may. EPA said that the agency has approved alternative fuels, such as natural gas, in response to petitions under this provision. And in its response brief, after we pointed out that that's not the case, it cited an alternative provision, 86.113-94G. That provision was not cited anywhere in the natural gas rule, and the rule makes clear that it was not responding. It's evident from the record that the natural gas rule was not promulgated in response to a petition under that or any other rule. Okay. Thank you. Thank you, Your Honor. Good morning, Your Honors. My name is Mike Augustini for EPA. With me at the counsel's table is Mark Carioca from the Office of General Counsel. I'd like to begin by picking up on some of the points made in the questioning of the Petitioner's Counsel. First, we agree that this matter is not right for review at this time, and it should be dismissed on that basis alone. How do you square that with Abbott Labs? I mean, the whole theory of judicial review of agency action post-Abbott Labs is that we don't wait for it to be applied in practice. We look at the legal requirement and try to square that and determine whether that legal requirement set forth in the rule is consistent with the statute or is otherwise arbitrary and capricious. The agency could always argue that, well, it's going to be applied and enforced in a different way, but Abbott Labs just rejects that whole premise. Well, for one, Your Honor, the alternative test rule provision applies to vehicle manufacturers. It doesn't apply to these petitioners. Well, that seems like a distinct argument. Well, and second, Your Honor, this provision does not require vehicle manufacturers or the ethanol industry to do anything. There are no enforcement consequences. I understand, but on the commercially available, on the ripeness angle of it, you're saying they're saying the commercially available requirement that's in the regulation is inconsistent with the statutory scheme here as a matter of law, and it seems like we can determine whether it's inconsistent with the scheme as a matter of law. Of course, it could be applied in different ways. That's always the case with agency regulations. Well, it's their argument that it's impossible for anyone to ever comply with this provision, and that's the reason that their harm is inherently speculative. That's requiring the court to say this provision is unreasonable under all circumstances, but there's no specific statutory provision that says EPA can't issue a rule like this. It's a discretionary provision, and the question is, under the ripeness factors that the Supreme Court and this Court has adopted, is whether judicial review would be more suitable based on a complete record. A more complete record that involves a specific request for using an alternative test fuel where EPA can apply the commercial availability factor and the other factors, and if it grants the request, then there's no need for judicial review at all. On the other hand, review is available if it's an adverse decision, and the vehicle manufacturer wants court review at that time. There's a concrete basis then to say whether it's impossible or not, or there will be a better record to determine whether there are circumstances. I think their argument is that it's unreasonable to impose this barrier, commercial availability in this scheme, given the overall nature of the scheme. But in terms of the standing issue, because you've incorporated that, it seems to me this is like a raw materials case. And so if there were a law that said you can't use sugar in soda, soda manufacturers can't use sugar in soda, would the sugar manufacturers have standing to challenge a law like that? It sounds like they would have a pretty good argument. Yeah, exactly. Can you just respond on the merits of – I think I'm asking the same question. Why isn't that this case? It's just on the merits. What is the process that you contemplate that fuel manufacturers and auto manufacturers should undergo, given this sort of what the Petitioner calls logical impossibility or chicken and egg problem? What's your response to why this regulation would impose that kind of barrier? There's certainly no prohibition on using alternative test fuels. The rule invites vehicle manufacturers to come to the agency with a specific request that details the design of the engine, the fuel that's supposed to be used, how that's going to be available on the market, and that it most informally that the purpose of the provision is not misfueling someone at a pump, putting in E15 when their car is meant for E10. It's fundamental to the whole emissions program. What about the kind of labeling regime that Petitioner's counsel mentioned? With diesel, don't use this. Aren't there a lot of cars not, in fact, flexible in the way that they could use fuels that are not made for them? Flexible fuels, yeah. They could use a range of gasoline fuel with differing ethanol contents. But just to make sure, I circle back to your initial question. The idea is there is some burden on the vehicle manufacturers because they're making the cars that are the pollution sources. So the burden is on them to do some development and come to the agency. And as the comments that Ford Motor Company made, there will be a collaborative process between the automaker, the agency, other stakeholders, retailers, all those things. The standard doesn't say come to us with a plan for rendering an alternative test fuel commercially available. It says anything you propose as an alternative test fuel must be commercially available. So it sounds like you're reading it a little more squishy than Petitioner. I'm sorry, Your Honor. I thought you were asking how it works in practice. I'm just saying why is it written in a way that sounds so much more rigid than what you describe? Well, I think it's clear that EPA's intent, as reflected in the preamble, that it's available under certain circumstances, that it's certainly not impossible. And if you're asking about the language of the rule and the interpretation as a factor versus a requirement, I wanted to respond to the argument that Petitioner's made that it's inconsistent with the plain text and actually inconsistent with the regulatory history. The fact of the matter is, and I'll give the Court the sites to trace this through, the test fuel provision was written in mandatory terms in one of the prior versions. And it did not include the word generally as a qualifier. And so it's important for the Court to look at the changes that were made between the 2005 version and the 2008 version. That's when 2005 did not have the word generally in it at all. And it actually said the vehicle manufacturer must show all of those factors. The site to that is 70 FEDREG at 4594. And the site to the 2008 provision where the changes were made that eliminated the requirement are at 73 FEDREG at 37339. And so what they're saying is that this is clear evidence that EPA intended them to be factors. What they're saying is the Court should ignore the changes that EPA made and disregard its interpretation. And you're saying the change was in the direction of a kind of leniency and more context-specific showing. Exactly, Judge Pillard. The language went from you must show 1, 2, and 3 to we will generally approve without any of that mandatory language that was in the prior version. And this rule is intended more or less to codify the practice of the agency which has long taken commercial availability into account. I agree. That's correct. Commercial availability has long been a consideration. It's an appropriate consideration. That's the meaning behind the reference to natural gas in the comment response document. And what EPA was conveying is that we do not intend there to – this rule does not alter our practices. We're still going to consider requests for alternative test fuels and we'll approve them when that's appropriate. So if GM came up with the petitioners here and said, you know, it's our plan to develop and market in the United States an E30 fleet of light vehicles, and, you know, here there are already these flex pumps that can be turned on overnight and here are other distributors that would be willing to either install that technology or some E30 pumps, you couldn't say that this rule would foreclose approval of that plan? Absolutely. It has to be a decision based on the concrete circumstances before the agency. But certainly that's not what EPA did or intended in the rule. Vehicle manufacturers were coming forward with any new technology. And that's the purpose of the provision. What about – you heard my questions to your opposing counsel. What about the catch-22 that they say comes in because the statute links back to the test fuels and then the test fuels now link to the statute for introducing a new fuel into the market, and then, of course, this reg with the test fuels links to the market. So it's a catch-22 that prevents them from introducing a new fuel or at least getting it off the ground and people aren't going to make investments unless they see some legal prospect of getting it approved. The rule does not create a catch-22. There are market conditions that are present regardless – even if you're approved to go forward with a test on an alternative fuel, you still have to get the fuel into the market. It has to be registered. The gasoline is designated, and that entails registration requirements, which means testing to what the constituents of the emissions are and showing that there are public health risks associated with them, essentially, and then obviously getting a retail distribution chain in place. But the statute, I'm correct, links back for introducing a new fuel into the market, links back to test fuels, right? It's – I'm not sure I understand. Explain the substantially similar provision. Okay, so the substantially similar provision prohibits introduction into commerce fuels that are different than what are substantially – they have to be substantially similar to be introduced into commerce. And so they're – it's a – Substantially similar to test fuels that have been approved. It's really a different process. Approving a test fuel is different than showing something is substantially similar. For example, the EPA approved recently E15 under the substantially similar exception. That's not approved as a test fuel. It was approved under that exemption. And so, you know, there's a relationship. I mean, how – you know, setting the conditions for the market between those two. But the bottom line on the chicken and the egg is that there's nothing unreasonable about EPA anticipating that there will be parallel lines of development in the auto industry and in the fuel industry. They don't – one doesn't have to wait for the other. They can work together. And that comes through clearly in Ford's comments. They say, we understand. We have to get – we're not ready to do this. We have a lot of work to do. We have to get stakeholders together. We have to talk with the agency. But we look forward to a coordinated approach in the future. And that's what EPA envisions, and that's how a fuel can get on the market, you know, I just want to circle back, Your Honor, to make sure I was clear on the purpose of the matching the test fuel to the fuel that's used. And this is a policy that comes from, first, the statute. It's in 7525H. It is, you know, Congress instructing EPA to have testing regulations that reflect actual driving conditions. It's been a longstanding policy of EPA. It's been implemented in different – the different test fuel proceedings over time. And it's basically intending to prevent a gaming of the testing process. You don't want a vehicle manufacturer to use one fuel in the testing process that results in lower emissions, knowing that there's going to be a different fuel used when people are actually driving around on the roadways. That undermines the whole system of emissions control and compliance with the standards. So it's certainly a reasonable factor to consider. It's not been interpreted as a requirement, but EPA would expect to hear how the vehicle manufacturer is going to ensure that the fuel that they test on is actually going to represent the actual driving conditions, emissions performance of the vehicle in the real world. I just want to add that we don't believe that there's any actual or imminent injury today from this provision. There is a phase-in period. And so as a legal matter, 1065-701-C2 doesn't apply to anyone today. A vehicle manufacturer could submit a request tomorrow, and EPA would consider it without that provision. Although that seems sort of, you know, a little unfair for a couple of reasons. One is that, as you said, this really has been the practice, so you already have a commercial availability criterion. But the other may be more formally clear is that it takes a long time to develop a vehicle, and you want to be able to choose far in advance what you sink your R&D investments into. And so, you know, these are business people trying to be responsible and figure out what climate they're going to face in figuring out where to invest. That is true, Your Honor, but the fact of the matter is this provision does not stop anybody from requesting approval of an alternative test fuel today. I mean, it's known that EPA will consider commercial availability. I'm presuming that if they did that and they got a logical impossibility answer from you, they would be back here complaining about that. That may be the case, and it also may be EPA approves the test fuel and there's no occasion to have further judicial review. They're saying commercial availability just shouldn't be considered, however. You're saying it should be. That seems like a ripe legal dispute, because I sensed ripeness in your last answer. Well, that's not the – I guess that's a – what I would say to that is that there would be a better record that's developed on a concrete level, whether it's appropriate. We think it's appropriate to consider commercial availability. It's reasonable to do so. But they're going one step further and saying it's impossible for anyone to comply, and that's the basis for finding that they're arbitrary and capricious. And that really is a hypothetical at this point, and the agency can apply its provision, and the court will have a better record to determine really whether it's reasonable at that point. I don't have anything further, Your Honor, unless there are questions. Anything? Okay, well, thank you. Did counsel have any time left? You can take two minutes if you'd like. I think the most interesting thing that I heard in my colleague's argument here is that EPA acknowledges that it will consider commercial availability even under 86.113-94G. This alternative provision that it says for the first time is now – provides an alternative mechanism for asking for new fuels. But doesn't the agency have to? I mean, it almost would be arbitrary and capricious under the Act not to consider commercial availability, some of the reasons that your opposing counsel has explained. The critical detail here is that it's not just theoretical future commercial availability, but current commercial availability. If we look on page 41 of the government's brief, 41 and 42, it's clear the government says that it will look at the current availability of the fuel, and that is what we've shown is impossible for the industry to show. We heard reference to Ford's comments. Ford made clear that its interest in a high-octane, high-ethanol fuel is immediate. It wants progress on this by the 2017 midterm review for CAFE. The injury that we're faced with now is not a future injury. It's a current injury to the value of these petitioners' ongoing operations. We've put in an expert declaration from Professor Babcock pointing out that, in paragraph 26, that the current value of those operations is affected by this rule. The government's new claim that the rule offers discretion shouldn't make a difference, but if more declarations are needed, this court has authority to request supplemental declarations on standing. I'm sorry, I just wanted to get the – you had pointed us to pages 41 and 42 of EPA's brief? Yeah. About current – that they were insisting on current availability, and I'm just looking at that. The heading says it's reasonable for EPA to consider the current marketplace. The current marketplace, okay. So that's the – and on page 42 it says, near the bottom, five lines up, it's both reasonable and responsible for EPA to consider the prevailing marketplace conditions, and specifically a proposed fuel's commercial availability. And that's consistent with what we've heard this morning. To pick up on Judge Pillard's question on if EPA said we're going to use test fuels to determine possible emissions that aren't actually used in the market, isn't that itself unreasonable in the sense that the emissions data you get from a fuel not actually used in the market is not going to be what actually occurs when the engine's used in the real world? To be clear here, though, we're talking about something different than current commercial availability. We're talking about whether the fuel's likely to succeed in the marketplace. And that's certainly of prime importance to the auto industry, and that's precisely why they're interested. I'm talking about from EPA's perspective. We're testing for emissions. We're testing an engine for emissions. And if EPA came in and said, oh, to test for emissions, we're going to use a fuel that's not actually going to be used when the car is driven, on its face that sounds a bit unreasonable. That's not what we're asking for, but I would point out that's exactly what's happening today. Why is that not what you're asking for? We think that the fuel that's approved should be approved for vehicles that will run on that fuel. And just as diesel, the diesel test fuel is used for vehicles that will run on diesel and, in fact, can only run on diesel. So this is your chicken and egg problem because once it's approved as a test fuel, it will be used in the marketplace. That's right. And, therefore, it will be tested in a way that reflects the marketplace. That's correct. There might be some lag time, but it will square up in some sense. Well, and the reality of the situation is that the first vehicles that are certified on a new mid-level ethanol blend test fuel may well be flex fuel vehicles with a lower range of flexibility that can still be optimized for the higher octane much more efficiently than a flex fuel vehicle that has to be optimized up to E85. And those vehicles could run by definition. They would have to be able to run just as well and meet EPA's emission standards on the E10 and on E30. So we should be clear about the difference between optimized vehicles, which can run on a range of fuels, and dedicated vehicles, which can only run on a specific blend. Okay. Thank you. No. Okay. Thank you. Case is submitted.
judges: Tatel, Kavanaugh, Pillard